UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

RODNEY HOLLOWELL,

        Plaintiff,

   v.

KAISER FOUNDATION HEALTH PLAN
OF THE NORTHWEST, doing business as
KAISER PERMANTE,

        Defendant.

_____

Case No.: 3:12-CV-2128-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

   Plaintiff Rodney Hollowell ("Hollowell"), filed this action against his employer Kaiser

Foundation Health Plan of the Northwest ("Kaiser"), alleging various claims for discrimination

based on Hollowell's sex and race as well as violations of the federal and state family and medical

leave acts.  Addressed in this Findings and Recommendation are Kaiser's motion for summary

judgment on Hollowell's claims under the federal Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 (the "Federal Act"), Oregon's Family Leave Act, OR. REV. STAT. 659A.150-659A-186 (the "State Act")(collectively the "Acts"),the Civil Rights Act of 1991, 42 U.S.C. 1981 ("Section 1981), and OR. REV. STAT. 659A.030 ("Section 659A.030").[1]  Hollowell  voluntarily withdrew his Oregon state law disability claims asserted in his Third and Fourth Claims for Relief.

The court finds that Hollowell's claims under the Acts are barred by the applicable statute of limitations and that he has failed to prove he suffered the adverse employment action required to support his claims under Section 1981 or Section 659A.030.  Accordingly, Kaiser's motion for summary judgment should be granted in its entirety.

*Preliminary Procedural Matter*

In its reply brief,  Kaiser objects to a number of Hollowell's evidentiary offerings based on relevance, hearsay, and foundation arguments.  Hollowell argues that Kaiser's evidentiary objections are unclear and nonspecific and, therefore, waived.  Hollowell also contends that all evidence offered is relevant, is either not hearsay or subject to a hearsay exception, and is based on personal knowledge.

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated and admissible under the Federal Rules of Evidence.  FED. R. CIV. P. 56(c) (2013).  The court must determine what evidence is admissible, relevant, and substantive.  FED. R. EVID. 104 (2013).  A party filing a motion for

---

[1] Kaiser and Hollowell filed cross-motions for partial summary judgment on Hollowell's Fifth Claim for Relief under the Equal Pay Act and his Section 1981 claims based on a wage disparity and his job assignment asserted in his Sixth and Seventh Claims for Relief.  These motions have been addressed by the court in a separate Findings and Recommendation.

summary judgment will generally support that motion with affidavits or declarations. Rule 56 requires that the affidavits or declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

## I. Admissibility at Trial

Hollowell asserts that because the evidence offered by him could be presented in an admissible form at trial, it should be considered by the court at this summary judgment stage. Rule 56 specifically states that an affidavit or declaration used in support of, or opposition to, a motion for summary judgment must "set out facts that would be admissible in evidence." FED. R. CIV. P. 56(c)(4). The Ninth Circuit has construed this standard to allow the consideration of evidence on summary judgment if the evidence could be produced in an admissible form at trial. In *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), the court explained that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." It then overruled defendants' hearsay objection to the admission of plaintiff's diary offered as an exhibit to her declaration, noting the contents of the diary were within the personal knowledge of the plaintiff and could be admitted at trial through plaintiff's testimony, to refresh her recollection, or as a recorded collection. *Id.* at 1037. Ultimately, if the contents of the evidence offered through a declaration are within the declarant's personal knowledge and could be presented in an admissible form at trial, the evidence must be considered on summary judgment. *Id.*

Here, Kaiser objects primarily to the content of the evidence offered by Hollowell, not the form of the evidence offered. The court's determination that a declarant lacks personal knowledge

or that evidence offered is irrelevant to the matters before the court is based solely on the content offered, not the form in which it was offered.  With regard to hearsay statements contained in declarations, affidavits, and exhibits, the court has addressed Kaiser objections to the evidence offered, as well as Hollowell's arguments that the evidence would be admissible at trial if offered in another form where Hollowell has specified the form in which the evidence would be considered admissible.  In a few instances, the evidence objected to has been offered in more than one form, such as through more than one declaration or in a declaration and an exhibit.  A finding by the court that the evidence is inadmissible in one form is not a finding that the evidence is inadmissible in all forms.  Accordingly, the court has considered evidence which it found to be inadmissible as presented in one form when the evidence has also been, or could have been, offered in a form admissible at trial.

## II.  Unclear and Nonspecific Objections

Hollowell argues that because some of Kaiser's evidentiary objections are unclear and nonspecific, they are waived.  In support of this argument, Hollowell relies on the court's denial of the plaintiff's motion to waive the defendant's evidentiary objections which were made in a reply brief in *Fraser*. *Id*. at 1036.  The court described the objections as "clear, specific, and timely made to the district court" and found they were properly preserved. *Id*.

Here, Kaiser objected to portions of the declarations offered by Hollowell arguing they contain hearsay statements which it describes as "testimony of [witnesses] who gained most if not all of their knowledge of relevant events from information provided to them by others."  (Def.'s Reply in Supp. of Mot. for Summ. J. on Remaining Claims ("Def.'s Reply") at 27.)  Kaiser does not specifically identify the objectionable hearsay statements but does identify the paragraphs containing

the statements and generally indicates why the statement in that paragraph is hearsay.  For example, Kaiser objects to paragraph 23[2] of Hollowell's declaration because it contains statements which describe what Hollowell learned from unidentified sources.  Hollowell argues these objections are unclear and nonspecific because he is unable to determine which statements Kaiser is objecting to. Paragraph 23 of Hollowell's declaration provides:

> I was placed on Level 1 ("L1") CAP in December 2008, by Ms. Terwilliger for not clocking in and out in spite of the fact that I explained that I was clocking in and out and using the IVR time system properly.  I later learned that many employees in not just my department but the entire hospital were also having problems clocking in and out as a result of problems with the IVR time system.  I also later learned that manay employees were aware of the problems with the IVR system and that some supervisors and manager[s] were aware of the problem.  The[re] were problems with the IVR system hospital wide and they continued for several years.

It is clear to the court from the objections and the content of the paragraph that Kaiser is objecting to the last three sentences as they describe information Hollowell learned from unidentified sources.

The court has reviewed Kaiser's objections and the paragraphs objected to and has been able to identify at least one sentence in each paragraph which falls within Kaiser's description of the hearsay statement.  The court finds that such objections were made with sufficient clarity and specificity for the court to understand the objections made and the evidence objected to.  Kasier's objections were properly made and timely filed.

## III.  Relevance

At the summary judgment stage, the court must look at the evidence presented to it by the parties and, initially, determine if there is a genuine issue of material fact.  While engaging in this task, the court must necessarily apply the underlying summary judgment standard when it encounters

---

[2]Kaiser identifies paragraph 13 in its reply but it is clear from Hollowell's declaration and the objections made that Kaiser intended to reference paragraph 23.

evidence that is irrelevant, speculative, ambiguous, argumentative, or constitutes a legal conclusion exclusively within the purview of the court's consideration. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E. D. Cal. 2006)(noting that various evidentiary objections, such as relevance, were redundant at the summary judgment stage where the court can award summary judgment only in the absence of a genuine issue of material fact based on evidence the contents of which must be admissible). The court will not analyze Kaiser's objections to Hollowell's evidence on any of these grounds independently of its consideration of the merits of the underlying summary judgment motion as these objections are redundant to the ultimate determination of whether a genuine issue of material fact exists and any discussion of the objections at this juncture would be superfluous. Accordingly, the court will not address these objections in detail in this Findings and Recommendation unless required to resolve objections on other grounds.

The same can not be said of objections that are based on the admissibility of the evidence, such as objections based on hearsay or lack of foundation. The Ninth Circuit has generally applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by the parties at the summary judgment stage. *Orr v. Bank of America*, 285 F.3d 764, 778 (9th Cir. 2002); *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). Similarly, the Ninth Circuit requires that affidavits offered in support of summary judgment be based on personal knowledge. *Bliesner v. The Communication Workers of America*, 464 F.3d 910, 915 (9th Cir. 2006).

## IV. Hearsay

Kaiser objects to portions of various declarations and certain exhibits arguing they are inadmissible hearsay. Hearsay is defined as an out-of-court statement offered in evidence to prove

the truth of the matter asserted. FED. R. EVID. 801.  Hearsay is admissible only if it qualifies as an exception to the general hearsay rule.

### A.  Hollowell Declaration

#### 1.  Paragraph 19

Hollowell represents that during the restructuring of Kaiser in late 2008, La Donna Sullivan ("Sullivan"), manager of Kaiser's Environmental Services Department ("EVS"), told minorities that "there were no assignments available and that they would have to file unemployment."  (Hollowell Decl. ¶ 19.)  Hollowell asserts he is offering the statement to shed light on the state of mind of Sullivan, not for the truth of the matter asserted.  However, it is clear that Hollowell is offering this statement to establish that Sullivan was discriminating against minorities.  Therefore, he is offering this statement to prove the truth of the matter asserted therein – that Sullivan was using the restructuring to get rid of minority employees.  The statement is, therefore, hearsay.

Hollowell argues the statement qualifies as an admission under FED. R. CIV. P. 801(d)(1) or (2), or as a statement against interest under FED. R. CIV. P. 804(b)(3), and it, therefore, admissible.[3]  Rule 801(d)(1)(A) allows a party to offer hearsay statements taken under oath in a prior formal proceeding if the statement is inconsistent with a witness's testimony at trial and the witness is subject to cross-examination concerning the prior statement.  Sullivan did not make the statement under oath.  Accordingly, this exception is not applicable.

Rule 801(d)(2) exempts from the hearsay rule statements that qualify as admissions by an opposing party.  To qualify as an admission, the statement must be contrary to the position taken by

---

[3]Hollowell argues the same exceptions apply to all of the statements in his declaration objected to by Kaiser.

the opposing party at trial.  Kaiser asserts that it did not discriminate against minorities, a position clearly contrary to Sullivan's statement.  Accordingly, the statement may be considered an admission under Rule 801(d)(2).  The question then becomes whether Sullivan was speaking as an agent of Kaiser at the time of the admission.

A statement of an employee qualifies as an admission by an employer only if "made by the . . . employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D).  Hollowell's declaration makes it clear that Sullivan was acting in a supervisory capacity for Kaiser when she allegedly made the statement.  As such, the statement qualifies as an admission and is exempt from the hearsay rule.

That finding, however, does not end the discussion.  Hollowell indicates that Sullivan made the statement to "many of the African-American and minorities," not that Sullivan made the statement to Hollowell.  If Hollowell heard the statement from someone other than Sullivan, a second layer of hearsay exists.  Rule 805 of the Federal Rules of Evidence provides that:

> Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

The statement from a third party to Hollowell that Sullivan made the statement is offered to prove the truth of the matter asserted – that Sullivan did in fact advise minorities there were no jobs for them and they needed to apply for unemployment.  Hollowell has failed to establish he heard Sullivan make this statement.  In fact, because Hollowell continues to be employed by Kaiser, is it more likely than not Sullivan did not advise Hollowell he had no job and needed to file for unemployment. Consequently, the statement relayed to Hollowell from a third party is hearsay.  This second layer of hearsay does not qualify for either exception under Rule 801.  It was not given under

oath and, as the speaker is unidentified, Hollowell has failed to establish they are entitled to speak on behalf of Kaiser.

The final exception asserted by Hollowell is Rule 804(b)(3), which provides an exception to the hearsay rule if the declarant is unavailable to testify and the hearsay statements were against the declarant's proprietary or pecuniary interest. While Sullivan's statement may be against Kaiser's pecuniary interest, there is no evidence the statement was against the unidentified third party's interest. Accordingly, the statement offered in paragraph 19 of Hollowell's declaration is hearsay, does not qualify for any exception, and is inadmissible. Kaiser's objection is sustained.

### 2. Paragraph 23

In paragraph 23, Hollowell discusses information obtained from other employees that they were having trouble clocking in and out of Kaiser's time record system, which problem continued for several years, and that Kaiser management was aware of the problem. As Hollowell is using this information to establish he was not the only one failing to clock in and out appropriately, he is offering the statements to prove the time record system was not working correctly. Hollowell is offering the statements to provide the truth of the matter asserted.

The statements were not given under oath, Kaiser does not argue it was not having trouble with its time record system, and the statements are not against the pecuniary interests of the declarants. The statements are inadmissible hearsay. The objection is sustained.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

### 3. Paragraph 24

Hollowell offers a statement from a coworker that Hollowell's direct supervisors Diane Terwilliger ("Terwilliger") and Michael Modica (Modica"),[4] told the coworker Hollowell "must be a drug dealer." Hollowell is not offering the statement to prove the underlying statement is true – that Hollowell is a drug dealer. Therefore, the statements made by Terwilliger and Modica are not hearsay. Hollowell is offering the statement from the coworker to prove Terwilliger and Modica made the underlying statement to the coworker. The coworker's description of the underlying statement to Hollowell, which is an out-of-court statement offered to prove that the statement was made, creates a second layer of hearsay. In the absence of any indication of the identity of the coworker, Hollowell has failed to establish that the coworker's statement is protected by Rule 801 or Rule 804. Kaiser's objection is sustained.

### 4. Paragraph 27

In paragraph 27, Hollowell recounts arguments made on his behalf in the grievance of his medical leave absences and Kaiser's response to those arguments. To the extent Hollowell is offering the "arguments" to prove the truth of the arguments – that he had completed all of the required medical leave paperwork and complied with Kaiser's requirements – the arguments are inadmissible hearsay. To the extent Hollowell is offering the arguments to merely prove that the arguments were made, they are not hearsay. Kaiser's objection is overruled to the extent Hollowell is offering the statement to establish the claims asserted and arguments made in his grievance.

---

[4]Terwilliger, an EVS Supervisor was Hollowell's direct supervisor from 2008 until December 2009, and Modica, also an EVS Supervisor, took Terwilliger's position and was Hollowell's direct supervisor until he left Kaiser in August 2010. (Hollowell Decl. ¶¶ 9, 49; Sullivan Decl. ¶ 28; Hollowell Dep. 14:18-24.)

### 5. Paragraph 35

This paragraph describes knowledge obtained by Hollowell with regard to coworkers' alleged unauthorized use of codes to be paid at a higher wage rate, with no resultant discipline, and that one of the coworkers was spying on Hollowell for Modica. All of these third-party statements are offered for the truth of the matter asserted and are hearsay. Hollowell does not indicate from who he obtained this knowledge and, therefore, has failed to establish the statements were admissions properly attributable to Kaiser. The objection is sustained.

### 6. Paragraph 49

Hollowell describes incidents in 2012 where Modica, who was terminated in 2010, threatened Hollowell and used racially derogatory epithets toward him. The specific language used by Modica is not identified by Hollowell inferring that Hollowell is offering this evidence to prove that Modica made derogatory statements to him, not that the statements were true. Accordingly, the statements referred to in this paragraph are not hearsay. Kaiser's hearsay objection to this paragraph is overruled. [5]

### 7. Paragraph 50

In paragraph 50, Hollowell recounts a conversation he had with Modica in late 2010, after Modica was terminated, in which Modica apologized to Hollowell for his mistreatment, explaining that Sullivan told him to "do those things." (Hollowell Decl. ¶ 50.) He also states that in early 2012,

---

[5]Kaiser also appears to object to this evidence on relevance grounds, noting that these statements occurred after Modica was terminated. As discussed above, the court's determination of what is relevant is encompassed within its consideration of whether genuine issues of material fact exist to prevent the granting of summary judgment.

Gerrard Ingram, EVS Supervisor ("Ingram"),[6] "also told me that he only did those things to me because he was told to do so." (Hollowell Decl. ¶ 50.) Hollowell is clearly offering these statements to prove that Sullivan, or other Kasier management, told Modica and Ingram to mistreat Hollowell.

The underlying statements by Sullivan, or other Kaiser management, directing Modica and Ingram to mistreat Hollowell, are hearsay. However, as Sullivan, or other Kaiser management, were arguably acting as agents of Kaiser at the time they made these statements, they can be viewed as admissions of Kaiser and are admissible under Rule 801(d)(2).

While the underlying statements by Sullivan or other Kaiser managment to Modica or Ingram are not hearsay, the disclosure of the statements to Hollowell by Modica and Ingram create a second layer of hearsay. Modica's statements to Hollowell, which occurred after he left his employment with Kaiser, are not properly attributable to Kaiser and, therefore, not admissible as an admission. Ingram appears to have been employed as an EVS Supervisor, arguably a management position, at the time of his statement, therefore, his admission that he treated Hollowell poorly at the direction of Sullivan is properly attributed to Kaiser. Ingram's statements to Hollowell could be viewed as a admission by Kaiser and are exempt from the hearsay rule under Rule 801(d)(2). Kaiser's objection to Modica's statement is sustained while its objection to Ingram's statement is overruled.

### 8. Paragraph 58

Hollowell states Ingram told two of his coworkers that Hollowell would not be around for long, and reiterates that Ingram told him Sullivan instructed him to make things difficult for Hollowell. The underlying statements from Ingram to the coworkers occurred while Ingram was

---

[6]Ingram took over Modica's position as EVS Supervisor, and became Hollowell's direct supervisor, in August 2010 when Modica left his employment with Kaiser. (Hollowell Decl. ¶ 58.)

employed by Kaiser and could be viewed as an admission under Rule 801(d)(2).  The discussion of Ingram's statements between Hollowell and two unidentified coworkers, which is being offered to prove Ingram made the statements to Hollowell, is hearsay.  Hollowell's failure to identify the coworkers makes it impossible to determine whether their statements qualify for a hearsay exception. The statement from Ingram that Sullivan directed Ingram to make things difficult for Hollowell has been addressed above.  Kasier's objection to the coworkers's statements is sustained while its objection to Ingram's statement is overruled.

9.  Paragraph 59

Hollowell relates a incident in the Kaiser break room where "several white employees were sharing a picture of a black doll hanging on a rope" described to him by a coworker.  (Hollowell Decl. ¶ 59.)  Hollowell offers the description of the incident to prove that the incident occurred, which is hearsay.  Hollowell does not identify the white employees or the coworker.  Accordingly, the court is unable to determine if either the conduct or description is protected by an exception.  The objection is sustained.

10.  Paragraph 60

In paragraph 60, Hollowell again relates a break room incident which occurred outside of his presence.  A coworker used a racial epithet in reference to a speech given by President Obama which was reported by someone to Sullivan.  For the reasons stated above, the description of these statements by a coworker to Hollowell are also inadmissible hearsay.  The objection is sustained.

*B. Brooks Declaration*

Tessa Brooks ("Brooks") is a former employee of Kaiser who is currently employed by the Service Employees International Union Local 49 (the "Union").  (Brooks Decl. ¶ 1.)  Brooks worked

for the Union as either a steward or contract specialist from March 2011 to January 2013. (Brooks Decl. ¶ 2.) Brooks represented Hollowell in various greivances filed with the Union. (Brooks Decl. ¶ 2.) Brooks states that, based on her representation of Hollowell and her own experiences at Kaiser, she has "first hand knowledge" of the problems Hollowell faced at Kaiser and believes that Hollowell and other minorities were treated unfairly by Kaiser. (Brooks Decl. ¶¶ 4-5.)

        1. Exhibits C and D

Kaiser objects to the admission of portions of Exhibits C and D attached to Brooks's declaration arguing that to the extent they "summarize out of court statements, they are also inadmissible hearsay." (Def.'s Reply at 28.) In his response to Kaiser's objections to these exhibits, Hollowell apparently concedes the exhibits are hearsay but argues they are admissible under Rule 801(d) as admissions, a statement against interest, or to rebut allegations of fabrication, or under Rule 804(b)(3) if it turns out any declarant is unavailable for trial.

Page 1 of Exhibit C is a copy of a grievance intake form prepared by Brooks claiming that Hollowell was not being paid as much as his predecessor.[7]  Brooks represents in the form that she and Hollowell believe he should be paid floor tech wages as he is performing floor care work. (Brooks Decl. Ex. C at 1.)  While this representation is arguably a hearsay statement, the fact that Hollowell filed such a claim with the Union and is pursuing such a claim in this proceeding negates any possibility that the representation is less than credible or that Kaiser will be prejudiced by allowing admitting page 1 of Exhibit C.

The remainder of Exhibit C and Exhibit D consist of nine pages of notes from interviews

---

[7]Brooks describes Exhibit C as "true and correct copies of some greivances I filed on Mr. Hollowell's behalf regarding this matter" but only one grievance is found in Exhibit C.  (Brooks Decl. Ex. C.)

with individuals that appear to be Kasier employees, which Brooks compiled in her investigation of Hollowell's pay-related claims (the "Notes"). The interviews occurred between September 2011 and May 2012. The Notes represent various interviews with Brooks, or agents of Kaiser, asking questions of Hollowell, Tim Kylo ("Kylo"), and Laurel Cutler ("Cutler"), regarding Hollowell's assignment as a kitchen aide in 2010 and the restructuring of the kitchen aide position to eliminate floor care in 2009.[8]  The first four pages of the Notes represent discussions regarding Hollowell's return from an absence, his assignment to a floor care position, and the restructuring of that position. (Brooks Decl. Ex. C at 2-5.)  The fifth page appears to be minutes of a meeting relating to Hollowell's grievance of a claim based on the disparity between his wage rate and that of a floor tech. Brooks recounts statements made by "Nate" and Sullivan regarding the floor care position, the training of Cutler as a floor tech, and the wage paid her as a floor tech. (Brooks Decl. Ex. C at 6.) In page six of the interview notes, Kylo stated he performed a job for which he was not paid special floor care wages but that "Laurel" was paid the special floor care wage when she performed the same job. (Brooks Decl. Ex. D at 1.)  In page seven and eight of the Notes, Cutler indicated she was paid as a floor care technician while she was working the kitchen job, the kitchen job was restructured after she left, and if Hollowell runs a machine, he is a floor tech. (Brooks Decl. Ex. D at 2-3.)

Hollowell argues the Notes are still admissible under FED. R. EVID. 801(d)(1) and (2) as statements made by Kaiser employees during the course and scope of their employment and under FED. R. EVID. 804(b)(3) if any of the witnesses is unable to testify at trial.  As explained above, Rule

---

[8]One page of notes appears to be from an interview of an individual identified only as "Yvonne" who was asked if she was "getting paid for floor care while working in the kitchen." (Brooks Decl. Ex. D at 4.) The notes do not indicate the answer to that question. This page of notes has no bearing on the issues before the court and is stricken.

801(d)(1)(A) allows a party to offer hearsay statements taken under oath in a prior formal proceeding if the statement is inconsistent with a witness's testimony at trial and the witness is subject to cross-examination concerning the prior statement. The Notes were not taken under oath. Accordingly, this exception is not applicable. Subsection (B) of the same rule provides that prior consistent statements are not hearsay when offered to rebut a charge that a declarant's trial testimony was recently fabricated or based on improper influence or motive. All of the declarants, if called at trial, are expected to testify consistent with their statements recorded in the Notes due, in large part, to the fact that most, if not all, of the statements are consistent with other evidence in the record. Accordingly, it is unlikely Kaiser will argue that a declarant has recently fabricated their testimony, negating the need for Hollowell to offer the Notes to rebut the allegations of fabrication.

Rule 801(d)(2) exempts from the hearsay rule statements that qualify as admissions by an opposing party. To qualify as an admission, the statement must be contrary to the position taken by the opposing party at trial. Here, Kaiser does not dispute the primary issues addressed in the Notes – that Cutler, a trained floor care technician, was paid floor care technician wages while Hollowell was not, or that the kitchen job was restructured before it was assigned to Hollowell. The Notes, therefore, do not qualify under this exception with regard to these statements.

The only exception is the statement by Cutler that if Hollowell runs a machine, he is a floor tech. Cutler's statement regarding Hollowell's status as a floor tech is a statement of opinion, not fact, made by a Kaiser employee. Cutler is identified as a floor tech, not an individual with supervisory or management responsibilities. Additionally, there is no evidence Cutler was employed by Kaiser at the time she made this statement. Accordingly, Cutler's statement is not binding on Kaiser and does not qualify for a Rule 801(d)(2) exception.

Finally, Hollowell argues the Notes may be admissible if the declarants are unavailable to testify at trial. Rule 804 provides an exception to the hearsay rule if the declarant is unavailable and the hearsay statements were: 1) given at a prior trial, hearing or deposition; 2) under belief of impending death; 3) against the declarant's proprietary or pecuniary interest; 4) concerning personal or family history; or 5) offered against the party that wrongfully caused the declarant's unavailability. Hollowell relies on subsection three but has failed to establish that the hearsay statements in the Notes are in way against the proprietary or pecuniary interests of any of the declarants. Therefore, even if the declarants were unavailable for trial, the Notes would not be admissible under this exception.

Kaiser's hearsay objection to page 1 of Exhibit C to the Brooks declaration is overruled. Kaiser's hearsay objection to the rest of Exhibit C and all of Exhibit D to the Brooks declaration is sustained.

### 2. Paragraph 7

Brooks recounts a statement from a Kaiser employee that anyone who ran a floor scrubber was considered a floor care technician, and cites to the Notes as support for this statement. As noted above, this statement is made by an employee of Kaiser who did not serve in a managerial or supervisory capacity and may not have been working for Kaiser at the time the statement was made. The objection is sustained.

### 3. Paragraph 9

Brooks represents that the same female coworker made derogatory and racially offensive comments about President Obama in the employee break room, offending Hollowell and several other employees. Hollowell is not offering the derogatory comment about the President to prove the

truth of the matter asserted but, rather, to prove the existence of a hostile environment.  Therefore, the derogatory comment itself is not hearsay and is admissible.  However, there is no evidence that Brooks was present when the comment was made leading to the conclusion that she is repeating a description of the event by someone who was present, creating a second layer of hearsay.  Hollowell does not argue that description of the event to Brooks is not hearsay or that the statement is admissible under any hearsay exception.  The objection is sustained.

### 4.  Paragraph 17

Brooks represents that she "heard about Mr. Modica bringing a series of frivolous and unsubstantiated allegations against Hollowell" resulting in disciplinary actions.  Brooks presumably heard about this from Hollowell.  Hollowell is clearly offering this statement to prove the truth of the matter asserted therein.  The statement is inadmissible hearsay.  Hollowell argues that because Kaiser likely will deny Modica's conduct, his description of the conduct is admissible under Rule 801(d)(1)(B) to rebut allegations of fabrication.

Brooks's characterization of Modica's conduct as "frivolous and unsubstantiated" represents a legal opinion and will not be considered by the court.  The remaining statement, which is merely that Modica made complaints against Hollowell resulting in disciplinary action, is supported by evidence offered by Kaiser and, therefore, not likely to be denied by Kaiser.  The statement does not qualify for the asserted hearsay exception.  The objection is sustained.

### 5.  Paragraph 18

Brooks repeats comments she likely heard from Hollowell that Sullivan wrote-up Hollowell for not signing in or completing his task sheets.  Again, these out-of-court statements being offered for the truth of the matters asserted are hearsay and inadmissible.  And again, Hollowell argues the

statements are admissible to rebut allegations of fabrication if Kaiser denies Sullivan's discipline of Hollowell. Kaiser has offered Sullivan's disciplinary write ups in evidence, thereby admitting that Sullivan wrote-up Hollowell for time-related matters. The hearsay statement is not admissible under Rule 801(d)(1)(B). Kaiser's objection is sustained.

>       6. Paragraph 21

Paragraph 21 contains one of many statements specifically attributed to Hollowell. Brooks represents that Hollowell reported that Sullivan once said "there would not be any blacks working on day shift." (Brooks Decl. ¶ 21.) To the extent Hollowell offers this statement to prove that Sullivan said this, it is offered to prove the truth of Hollowell's statement and is inadmissible hearsay. Hollowell contends the statement is admissible to show the effect of the statement on Brooks, or as an admission under Rule 801(d)(1) or (2), an excited utterance under FED. R. EVID. 803(2), or a statement against interest under 804(b)(3).

The effect Hollowell's statement had on Brooks is irrelevant to the action before the court. Hollowell's statement was not made under oath so it is not protected under Rule 801(d)(1)(A). Under Rule 801(d)(1)(B), prior consistent statements are not hearsay when offered to rebut a charge that a declarant's trial testimony was recently fabricated or based on improper influence or motive. The prior consistent statement must have predated the alleged improper influence or motivation resulting in the fabrication. *Tome v. United States*, 513 U.S. 150, 157 (1995). Brooks does not indicate when Hollowell reported Sullivan's statement to her. The only logical conclusion from viewing Brooks's declaration in its entirety is that the reporting occurred after Hollowell initiated his grievance with the Union and Brooks was assigned to represent him with regard to this grievance. In this context, the motive to fabricate which the rule guards against is present. Consequently,

Hollowell's statement to Brooks does not qualify for this exception to the hearsay rule.

Rule 801(d)(2) requires the hearsay statement be made by an individual offered to speak on behalf of a party to the litigation. While Sullivan likely had such authority, Hollowell clearly did not. Therefore, his report of Sullivan's comment to Brooks does not bind Kaiser in any way. Rule 803(2) excludes from the hearsay rule statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it." As noted above, the Brooks declaration does not establish when, or under what circumstances, Hollowell told Brooks about Sullivan's statement. Accordingly, there is no evidence that Hollowell reported hearing the statement either while or immediately after he heard Sullivan's statement. Hollowed has failed to establish his report of the statement qualifies for the excited utterance exclusion.

Finally, Hollowell argues the statement would be admissible under Rule 804(b)(3) if Sullivan is unavailable for trial. However, Hollowell is submitting his own out-of-court statement describing Sullivan's comment, not Sullivan's comment itself. Hollowell will be attending trial and his statement is not contrary to his proprietary or pecuniary interest. Paragraph 21 is inadmissible hearsay not subject to an asserted exception. The objection is sustained.

### 7. Paragraph 26

Similarly, Brooks represents in paragraph 26 that Hollowell reported to her that "Swastikas and lighting bolts have appeared on the walls in the employee locker room." (Brooks Decl. ¶ 26.) Hollowell is offers this evidence to prove the existence of a hostile workplace which would require that the statement be true, implicating the prohibition on hearsay. Hollowell's description of what he saw would likely be admissible if offered directly by him. However, because Hollowell is offering Brooks's version of what Hollowell described to her, the hearsay rules come into play.

Hollowell argues the statement is admissible as an excited utterance. Brooks does not indicate the circumstances under which Hollowell shared this information with her which make it impossible for the court to determine whether Hollowell acted while perceiving the event or immediately after the event occurred. Accordingly, Hollowell has not presented evidence to support his claim that paragraph 26 is admissible as an excited utterance. Kaiser's objection is sustained.

### C. Leach Declaration

Vici Leach ("Leach") is employed by Kaiser as a medical assistant. (Leach Decl. ¶ 1.) She currently serves as a Union steward and, from January 2009 to February 2010, worked as a Union contract specialist. (Leach Decl. ¶ 2.) In this capacity, Leach represented Hollowell on various claims throughout the Union grievance procedure. (Leach Decl. ¶ 3.) Leach states that she has "first hand knowledge" of the problems Hollowell faced at Kaiser and believes that Hollowell was treated less favorably than his Caucasian coworkers. (Leach Decl. ¶¶ 3-4.)

### 1. Exhibits A and B[9]

Kaiser objects to the summaries of out-of-court statements found in Exhibits A and B to the Leach Declaration. Exhibit A includes intake forms and correspondence relating to Hollowell's April 2010 grievance of Kaiser's failure to assign him to a regular position. The only possible hearsay statement in Exhibit A is a statement from Hollowell to Leach that he "floated" once a week and had no regular assignment which is found in a grievance intake form. (Leach Decl. Ex. A at 1-2.) The statement is not hearsay to the extent Hollowell offers the form to establish he made the claim but is hearsay if Hollowell is offering it to prove that he floated.

---

[9]The copy of the Leach Declaration provided to the court by Hollowell did not include the exhibits referenced therein. The court has copied and is considering the exhibits attached to the declaration filed with the court.

Exhibit B includes what appears to be notes taken from an interview of Dan Dietz ("Dietz") by Leach on April 15, 2010, discussing Hollowell's assignments and bad attitude; notes from a discussion involving Sullivan, Hollowell, and Leach regarding Hollowell's failure to sign in and complete task sheets; and an email from Leach to Modica regarding the "floating" grievance. The email contains no inadmissible hearsay statements. The notes from the interview and discussion (the "Leach Notes") contain numerous hearsay statements in that Leach is summarizing statements from Dietz, Sullivan, and Hollowell made out of court and offered to prove the truth of the matter asserted therein.

Hollowell argues the Leach Notes are admissible to show Leach was involved in the grievance process and has first hand knowledge of the issues involved in this lawsuit. Leach's declaration establishes she was involved in the grievance process and Kaiser does not object to the consideration of the declaration for this purpose. Leach's summary of information obtained from other sources establishes on what basis she obtained her "first hand knowledge" of the issues before the court, and implicates the hearsay rule.

Hollowell argues the Leach Notes are admissible under Rules 801(d)(1) and (2) as statements made from Kaiser employees during the course and scope of their employments. The Leach Notes contain summaries of statements from Sullivan regarding Hollowell's alleged failure to sign in on at least four days in November 2010 and failure to complete kitchen task sheets, as well as Sullivan's taking pictures of the kitchen on two separate days in December 2010 between 8:00 a.m. and 9:00 a.m. to document Hollowell's work deficiencies. (Leach Decl Ex. B at 7.) Deitz comments on Hollowell's dissatisfaction with his job assignments, placement on the bottom of the assignment sheet, temporary assignments, and bad attitude. (Leach Decl. Ex. B at 1-3.)

These statements were not taken under oath as required under Rule 801(d)(1)(A). In light of the existence of documentary evidence supporting the statements in the Leach Notes, it is extremely unlikely Kaiser would object to trial testimony consistent with the statements as recently fabricated, eliminating the need for Hollowell to offer the prior statements in rebuttal under Rule 801(d)(1)(B).

With regard to Rule 801(d)(2), Hollowell clearly does not serve in a managerial or supervisory capacity and could not bind Kaiser with his statements. Hollowell does not identify Dietz's position with Kaiser or indicate whether Dietz was employed by Kaiser at the time of the interview. Accordingly, Hollowell is unable to establish Dietz had the requisite authority to speak on behalf of Kaiser at the time of the interview. Hollowell has identified Sullivan as his supervisor elsewhere in the record and has presented evidence that she was working in the same or similar capacity during the relevant period lending support to a conclusion that Sullivan could, in fact, speak on behalf of Kaiser. However, as Sullivan's statements are supported by documentary evidence elsewhere in the record, Kaiser is not likely to take a contrary position at trial. Accordingly, Rule 801(d)(2) is not applicable to the summary of Sullivan's statements recorded in the Leach Notes.

Hollowell argues the Leach Notes are admissible under Rules 803(5) and (6) as documents regularly created by Union representatives in the course of grievance proceedings. The exception found in Rule 803(5) is available only when a witness is unable to remember the events represented in the writing. Hollowell has not indicated that either Sullivan or Deitz has forgotten the information provided to Leach in the interview or discussion. Additionally, the written record must be made by the witness or, if created by a third party, the witness must adopt the record as their own at a time when the events are fresh in the witness's memory. *United States v. Collicott*, 92 F.3d 973, 984 (9th

Cir. 1996). The Leach Notes are identified as a recording created by Leach. There is no evidence that Sullivan, Dietz, or Hollowell adopted, or even reviewed, the Leach Notes.

Rule 803(6) allows the admission of business records containing hearsay statements if the record is made as a regular practice and kept in the course of a regularly conducted activity of an organization but only if "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." Even assuming Leach regularly prepared interview notes in her capacity as a Union steward, the Notes do not qualify for the business records exception because they were prepared in anticipation of Hollowell's grievances. "[A] document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness." *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir. 1981) (quoting *Palmer v. Hoffman*, 318 U.S. 109 (1943)).

Finally, Hollowell argues that the statements are admissible under Rule 804(b)(3) "if it turns out that Ms. Cutler or Mr. Kylo is unavailable for trial." (Pl.'s Surreply at 8.) The Leach Notes contain no statements from Cutler or Kylo so their presence at trial is irrelevant to the admission of the Leach Notes. Assuming Hollowell meant to refer to himself, Sullivan, and Dietz, he has failed to establish that the statements recorded in the Leach Notes are against their own proprietary or pecuniary interests preventing the application of Rule 804(b)(3) to the Leach Notes.

Kaiser's hearsay objection to Exhibit A is overruled to the extent Hollowell may offer the grievance form to establish he asserted a claim based on his lack of regular assignment. Kasier's hearsay objection to Exhibit B is overruled with regard to the email but sustained with regard to the Leach Notes.

/ / / / /

Page 24 - FINDINGS AND RECOMMENDATION                                    *{SIB}*

### 2. Paragraph 20

In paragraph 20, Leach explains that Hollowell told her his paychecks were continually short by one or two days. This is an out-of-court statement offered to prove the truth of the matter asserted therein and is hearsay. Hollowell argues it is admissible to show the effect the statement had on Leach, as evidence of Hollowell's state of mind, or under Rule 801(d)(1)(B) to rebut allegations the information was fabricated.

The effect the statement had on Leach is irrelevant to the issues before the court. If Hollowell is offering the evidence to prove that he was upset about being underpaid, the truth of the underlying statement is relevant. Under Rule 801(d)(1)(B), prior consistent statements are not hearsay when offered to rebut a charge that a declarant's trial testimony was recently fabricated or based on improper influence or motive. As noted previously, the prior consistent statement must have predated the alleged improper influence or motivation resulting in the fabrication. Leach does not indicate when Hollowell reported his underpayments to her. The only logical conclusion from viewing Leach's declaration in its entirety is that the reporting occurred after Hollowell initiated a grievance with the Union and Leach was assigned to represent him with regard to this grievance. In this context, Hollowell was motivated to fabricate the statement to support his claim against Kaiser. Consequently, the statement does not qualify for this exception to the hearsay rule. The objection is sustained.

### D. Butchek Declaration

Kayla Butchek ("Butckek") is employed by Kaiser as a swing shift lead who works in the same area and on the same shift as Hollowell. (Butchek Decl. ¶ 2.) In her declaration, Butchek represents she has "heard about Mr. Hollowell being disciplined and placed on administrative leave

by supervisor Mike Modica on several occasions for things that seem to be frivolous and designed to frustrate and humiliate him." (Butchek Decl. ¶ 6.)  Kaiser objects to the statement arguing it is inadmissible hearsay.  Hollowell is offering Butchek's description of what she has heard from others to prove that Modica disciplined Hollowell without justification and for improper reasons.  It is clearly hearsay.

Hollowell argues the statement is admissible to establish the effect of the statement on Butchek or his own state of mind.  The effect of the statement on Butchek is irrelevant to these proceedings.  There is no evidence that Hollowell was aware of the statement or what effect the statement, assuming Hollowell was aware of it, had on him.  Hollowell also argues the statement is admissible under Rule 801(d)(1)(B) to rebut allegations of fabrication.  Eliminating the opinion statements regarding the frivolousness of, and purpose for, the discipline, of which Butchek lacks personal knowledge and, therefore, a proper foundation, the statement becomes only that Modica disciplined Hollowell and placed him on administrative leave, actions that Kaiser concedes.  Accordingly, Kaiser is unlikely to object to the statement, eliminating the need to rebut any allegations of fabrication.  The objection is sustained.

E.  *Shambry Declaration*

David Shambry ("Shambry") is employed by Kaiser as a housekeeping aid.  (Shambry Decl. ¶ 2).  Kaiser objects to statements contained in paragraphs 7, 8, 12, and 16-25.  Hollowell does not argue the statements are not hearsay but does argues paragraphs 7, 8, and 21[10] are all admissible to show the effect of the statement on Shambry, as a statement against interest under Rule 801(d)(1)

---

[10]Hollowell also argues paragraphs 17, 18, and 26 are admissible on these grounds.  Kaiser does not object to these paragraphs.

or (2), or in the event the underlying declarant is unable to attend trial under Rule 804(b)(3).

### 1. Paragraph 7

Shambry represents that Dan Deeds, an EVS lead ("Deeds"), told Shambry that a dispatcher advised him Shambry, an African-American, was not doing his job properly. The effect of the statement on Shambry is not relevant to Hollowell's claims which infers that the statement is being offered to prove that a dispatcher complained to Deeds about Shambry's performance.[11] The underlying statement was not given under oath, there is no indication that Kaiser would deny the statement, or that either Deeds or the dispatcher had the authority to speak on behalf of Kaiser. Finally, the statement is not against the pecuniary or proprietary interest of any of the declarants. The objection is sustained.

### 2. Paragraph 8

Similar to the statement in paragraph 7, Shambry states that a Hispanic coworker told him that the same dispatcher complained about the Hispanic's job performance.[12] Neither Hollowell nor Shambry provide information regarding how the coworker came to know this information. Accordingly, it is impossible for the court to determine whether any hearsay exceptions apply. The objection is sustained.

### 3. Paragraph 12

Shambry recounts a conversation he had with Hollowell about Sullivan's threat that she

---

[11]As the effect of any of the statements on Shambry is not relevant to the matters before the court, to court rejects this argument with regard to all of the alleged hearsay in Shambry's declaration.

[12]Shambry also states that the Hispanic coworker told him he started keeping a log to rebut the dispatcher's claims. This hearsay statement is not relevant to the matters before the court and will not be considered.

would discipline Hollowell if he did not provide an obituary to support his request for bereavement leave. The paragraph implies that Shambry became aware of Sullivan's threat from Hollowell. Hollowell's statement is relevant only to prove that Sullivan threatened him. As such, it is hearsay. The statement was not taken under oath, Hollowell was not authorized to speak on behalf of Kaiser, and, as Hollowell's claims against Kaiser are well documented, it is extremely unlikely that it would object to Hollowell's statement as recently fabricated. The statements are in support of, rather than against, the proprietary or pecuniary interest of Hollowell. The objection is sustained.

### 4. Paragraph 16

Paragraph 16 contains a description of discussions Shambry and Hollowell had with regard to their frustration that a coworker received higher wages while doing the same job as Hollowell. It is evident that Shambry obtained this information about the wage disparity from Hollowell who, at least with regard to his coworker's wages, received the information from someone else. Hollowell's statement regarding his coworker's wages is not subject to any of the hearsay exclusions. The objection is sustained.

### 5. Paragraph 21

Shambry and Hollowell expressed disbelief and frustration over how they were being constantly harassed by their supervisors while Caucasian workers were not subject to the same treatment. Hollowell likely provided the information on how Modica, Sullivan, and Ingram harassed him to Shambry. Accordingly, Shambry's statements regarding this harassment are hearsay. The prior statements were not under oath, Hollowell did not have authority to speak on behalf of Kaiser, Kaiser is unlikely to assert that Hollowell's trial testimony is recently fabricated due to his consistent allegations, and Hollowell's statement was not against his pecuniary or proprietary interests. The

objection is sustained.

      6. Paragraphs 17-20 and 21-25

Kaiser asserts hearsay objections to the statements contained in these paragraphs describing conversations between Shambry and Hollowell regarding Kaiser's poor treatment of them based on their race. Hollowell does not argue that these statements are not hearsay or that they are subject to an exception. In light of the court's discussion and ruling on similar statements, the court finds that these paragraphs also contain inadmissible hearsay statements. The objections are sustained.

      *F. Thomas Declaration*[13]

Martha Thomas ("Thomas") is an African-American employed by Kaiser as a payment poster. (Thomas Decl. ¶¶ 1-2.) Kaiser objects to paragraphs 6 and 7 of the Thomas declaration in which Thomas represents that many African-American employees of Kaiser feel that Kaiser discriminates against them because of their race and does not properly address discriminatory conduct brought to its attention. While Thomas represents that this is very upsetting to her, Thomas's feeling about Kaiser's actions is not relevant to the issues before the court. Thomas's statements also represent information she gained from others which she fails to identify. As such, the statements are inadmissible hearsay.

## V. Lack of Foundation

Kaiser objects to statements made in a number of declarations asserting a lack of personal knowledge and, therefore, the absence of a proper foundation. Specifically, Kaiser objects to the lack of foundation for facts contained in the Hollowell, Brooks, Leach, Warner, Gardner, Butchek,

---

[13]Hollowell did not include the Thomas declaration in the Judge's copies provided to the court. The court will refer to the declaration filed with the court.

and Shambry declarations. Hollowell argues that Kaiser's objections are baseless and without

merit, and that the declarations are derived from personal knowledge and information acquired first-

hand while working with Hollowell.

The Ninth Circuit requires affidavits offered in support of summary judgment be based on

personal knowledge. *Bliesner v. The Communication Workers of America*, 464 F.3d 910, 915 (9th

Cir. 2006). Federal Rule of Evidence 602 provides that "[a] witness may not testify to a matter

unless evidence is introduced sufficient to support a finding that the witness has personal knowledge

of the matter." The evidence establishing personal knowledge of the matter may consist of the

witness's own testimony. *Id*.

The testimony of a witness, other than an expert witness, must be based on what he actually

observed or perceived through his own senses. In other words, the witness must have first hand

knowledge acquired by directly perceiving what they are testifying about. *Kesey, LLC v. Francis*,

Civil No. 06-540-AC, 2009 WL 1270249, at *1 (D. Or. May 5, 2009)(witness who did not see

removal of copyright designation from brochure proof could did not have personal knowledge that

brochure designer removed the designation); FED. R. EVID. 602, Adv. Comm. Notes (1972)("* * *

'[T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must

have had an opportunity to observe, and must have actually observed the fact' is a 'most pervasive

manifestation' of the common law insistence upon 'the most reliable sources of

information'.")(quoting MCCORMACK § 10, p. 19). A witness who merely repeats something that

someone else told them lacks personal knowledge of the facts offered. *Id*. (Rule 602 prevents a

witness from testifying to the subject matter of a hearsay statement.)

/ / / / /

A.  *Hollowell Declaration*

In paragraphs 10, 14, 17, 20, 22, 42, and 43, Hollowell comments on Sullivan's mental state, her treatment of others, and her communications with others.  Hollowell has no personal knowledge of Sullivan's mental state.  As he was not present to observe her interactions, or hear her conversations, with others, Hollowell did not personally perceive this conduct.  Accordingly, Hollowell lacks the requisite foundation to offer these facts.

Paragraphs 51-56, contain statements regarding Hollowell's job duties, coworker's job duties, coworker's wage rates, and who cleans the kitchen when he is absent.  Hollowell's statement regarding what he believe are his job duties, found in paragraph 51, are based on his perception and, therefore, are supported by a proper foundation.  However, there is no evidence that Hollowell has personally observed others performing similar work, using similar machines, or cleaning the kitchen in his absence.  Further, Hollowell, as a Housekeeping Aide, does not have access to personnel records of his coworkers and lacks personal knowledge of what his coworkers are paid.  Paragraphs 52-56 are not supported by a proper foundation.

Hollowell lack personal knowledge of the information contained in paragraph 61 in which indicates that a coworker was required to attend diversity classes and apologize to offended coworkers, as he was not present at the class, was not present when the coworker interacted with offended coworkers, and does not have access to personnel records.  Finally, in paragraph 63, Hollowell represents that Ingram and Sullivan took pictures of his work area long after he finished his work.  Hollowell was not present when the pictures were taken and has no personal knowledge of who took the pictures.  Kaiser's objection to these paragaphs is overruled with regard to paragraph 51 and sustained in all other respects.

Page 31 - FINDINGS AND RECOMMENDATION                                        *{SIB}*

### B. Brooks Declaration

Brooks make numerous statements based on "personal knowledge" but fails to reference evidence supporting a finding that she has the requisite personal knowledge. She represents that she has personal knowledge that Hollowell received $1.50 an hour less than females or Caucasians performing substantially similar work; that Kaiser supervisors were hostile toward Hollowell, engaged in deceptive tactics to undermine Hollowell, and used racial slurs against Hollowell; that other minority employees were being unfairly disciplined and terminated; and that Kaiser was not appropriately addressing employees' complaints.

Brooks states that she was previously employed by Kaiser, most recently as a pre-registration specialist, and that she has worked for the Union since March 2011. (Brooks Decl. ¶ 21.) She does not present evidence that she worked at Kaiser during the relevant period (from March 2010 through the present), held a position with Kaiser that would provide her with personal knowledge of the facts alleged, or was present when the conduct described occurred. It appears from the record that Brooks information was obtained from conversations she had with Hollowell or other Kaiser employees, not from her own personal knowledge of the matters described. Hollowell has failed to establish the proper foundation for the statements found in paragraphs 6, 9, 14, 15, 16, 19, 20, 24, and 25 of the Brooks declaration. The objection is sustained.

### C. Leach Declaration

Leach represents that she has "personal knowledge" regarding regarding Hollowell's work assignments, Hollowell's wage rate and the wage rate of coworkers who perform job duties similar to those performed by Hollowell, the treatment of Hollowell by his supervisors, and pictures taken of Hollowell's work area. Leach has been employed by Kaiser for thirteen years and is currently

employed as a medical assistant. (Leach Decl. ¶ 1.) As a medical assistant, it is unlikely she has access to Kaiser's personnel records, that she personally observed Hollowell perform all of his job duties in the kitchen, knowledge of his Caucasian female coworkers performing similar duties elsewhere, observed Hollowell's supervisors mistreat him, or observed pictures being taken of the kitchen. In the absence of personal knowledge of the facts testified to by Leach in paragraphs 7, 9, 10, 11, 13, 18, and 19 of her declaration, these paragraphs lack the requisite foundation. Kaiser's objection is sustained.

### D. Warner Declaration

Donna Warner ("Warner") was employed by Kaiser as a medical assistant from 1995 to 2009. (Warner Decl. ¶ 1.) She also worked as a Union steward, contract specialist, and organizer for the Union from 2005 through 2009. (Warner Decl. ¶ 2.) Warner represented Hollowell in Union grievances based on attendance issues and investigated allegations of time card fraud. (Warner Decl. ¶ 6, 11.)

In paragraph 9, Warner represents that from March 2009 to December 2009, while representing Hollowell, she "did not see Kaiser treat any employees in such an extreme manner as they did Mr. Hollowell for using or attempting to use FMLA/OFLA leave." While Warner clearly has personal knowledge of what she saw, she is testifying to what she did not see. There is no evidence that Warner had access to the records of others who used medical leave or that she was otherwise able to obtain personal knowledge of how Kaiser treated these employees.

Warner also discusses problems Hollowell had with pay while on administrative leave, the treatment of Hollowell by his supervisors from December 2009 to date, and the investigation of Modica for race and sex discrimination in late 2010. Warner worked for Kaiser as a medical

Page 33 - FINDINGS AND RECOMMENDATION                    {SIB}

assistant, not in Kaiser's human resource department; thus any information she obtained about Hollowell's pay issues had to be through Hollowell, not through personal perception. Warner was not employed by Kaiser after December 2009 and did not have the ability to see Hollowell's alleged mistreatment after he returned from administrative leave in December 2009, or participate in the investigation of Modica in 2010. Paragraphs 9, 13, 15, and 16 of Warner's declaration are not based on personal knowledge. The objection to these paragraphs are sustained.

### E. Gardner Declaration

Kristen Gardner ("Gardner") has been employed by Kaiser for ten years and is currently working as a medical assistant. (Gardner Decl. ¶ 1.) She worked as a Union contract specialist from 2007 to 2009 and periodically worked as a Union steward for about five years. (Gardner Decl. ¶ 2.) Gardner has represented Hollowell in Union grievances. (Gardner Decl. ¶ 4.) Gardner represents that she has personal knowledge of Kaiser's desire not to grant Hollowell medical leave to make Hollowell's life difficult for requesting such leave, and the nature of Hollowell's medical conditions.

Gardner is unable to personally perceive Kaiser's desires and is not Hollowell's physician, so she lacks personal knowledge of his medical conditions. Kasier's objections to paragraphs 6 and 9, which contain these statements, are sustained. Kaiser also objects to paragraph 13 which identifies Exhibit A as a correct copy of a grievance and related notes. To the extent Gardner prepared these documents, she has personal knowledge of their authenticity. The objection to paragraph 13 is overruled. Finally, Kaiser objects to Exhibits A and C of Gardner's declaration. The documents contained in these exhibits appear a grievance and notes prepared by Gardner, notes of a meeting which Gardner attended, and emails between Gardner and others related to Hollowell's greivance. Gardner has the requisite personal knowledge of the documents. The objection to

Exhibits A and C is overruled.

*F.  Butchek Declaration*

In paragraphs 5 and 9, Butchek represents that Hollowell's supervisors regularly check Hollowell's work area as much as eight hours after Hollowell cleans the area, that Sullivan does not check other employees' work in the same manner, and that Hollowell is paid less than others for doing similar work.  Butchek works in the same department and the same shift as Hollowell and, therefore, could observe supervisors checking Hollowell's work during her work hours.  However, Butchek states the reviews occur up to eight hours after Hollowell cleans the area.  Accordingly, it is unlikely that Butchek was present when the checking occurred.  While Butchek identifies herself as a shift lead in the EVS department, she does not indicate whether she has access to personnel records or knowledge of the tasks performed by Hollowell's coworkers.  These paragraphs are not supported by a proper foundation.  In paragraph 10, Butchek states that, "[f]rom what I have seen over the years at Kaiser, I personally feel that management does not make any real effeort to curtail the unfair treatment and discrimination against Mr. Hollowell."  To the extent Butchek is stating her personal opinion based on things she has personally seen, this statement is supported by a proper foundation.  Kaiser's objection to paragraphs 5 and 9 are sustained while its objection to paragraph 10 is overruled.

*G.  Shambry Declaration*

Shambry states that he has "personal knowledge" that Kaiser's time clock system is problematic, many employees have had troubles with the time clock system, and that Hollowell's paychecks were routinely short for many months.  If Shambry had troubles with the time clock, that is something he personally perceived and may testify to.  However, to the extent others had trouble

with the time clock, there is no evidence that he had access to time clock records or observed "many" employees having trouble with the time clock.  Similarly, there is no evidence Shambry had access to Hollowell's personnel records to personally perceive that Hollowell was not being paid what he was entitled to.  The objections to paragraph 14 are overruled with regard to any problems Shambry had with the time clock.  The objection to the remainder of paragraph 14 and all of paragraph 15 are sustained.

VI.  Conclusion

Kaiser's objections to Hollowell's evidence are sufficiently clear and specific.  Kaiser's relevance objections will be considered by the court as it addresses the merits of Kaiser's motion for summary judgment.  Kaiser's hearsay objections are overruled with regard to page 1 of Exhibit A of the Leach declaration, to the extent offered to establish Hollowell filed a claim based on his "floating" status; page 1 of Exhibit C to the Brooks declaration, to the extent offered to establish Hollowell filed a claim based on wage disparity; paragraph 27 of the Hollowell declaration, to the extent offered to establish Hollowell grieved his FMLA/OFLA claim; paragraph 49 and 50 of the Hollowell declaration; and paragraph 58 of the Hollowell declaration with regard to Ingram's statement that Sullivan directed him to make things difficult for Hollowell, and sustained in all other respects.  Kaiser's objections based on lack of foundation are overruled with regard to paragraph 51 of the Hollowell declaration; paragraph 13, and Exhibits A and C, of the Gardner declaration; paragraph 10 of the Butchek declaration; and paragraph 14 of the Shambry declaration, with regard to Shambry's trouble with Kaiser's time clock system, and sustained in all other respects.

*Background*

Hollowell is an African-American male who has was hired by Kaiser in June 1999 and is

currently in good standing. (Ferguson Decl. ¶2; Hollowell Decl. ¶¶ 2, 5; Hollowell Dep. 186:6-13.)

During his employment with Kaiser, Hollowell has had three brain surgeries (in 2003, 2005, and

2007), been diagnosed with gout, and suffered from back problems.  (Hollowell Decl. ¶ 7.)

Hollowell has worked primarily as a housekeeping aide at Kaiser.  (Hollowell Decl. ¶ 6.)

Kaiser housekeeping aides are assigned to clean specific areas by their supervisors and managers,

and are paid based on their Union classification and wage scale regardless of what areas they clean.

(Ferguson Decl. ¶ 3.)  EVS has a written policy covering the use of employees in areas to which they

are not regularly assigned, which provides:

> Management reserves the right to assign employees to areas for the purpose of
> providing order and consistency in the day-to-day operations of the Environmental
> Services Department.

> There will be occasions with it will become necessary to change employees from
> regularly assigned areas.  Such changes will be made when an employee is late, calls
> in ill at the last minute, or needs to go home unexpectedly.  Other situations may also
> necessitate changes in regularly assigned areas.  The Supervisor or Lead-on-duty will
> assess all situations and then made the necessary reassignment.

> When a reassignment in the area is made, it is management's expectation that the
> affected employee accepts the reassignment and work[s] to the same high standards
> they demonstrate in their regularly assigned areas.

(Sullivan Decl. Ex. P.)

Hollowell asserts he began to have problems at work when Sullivan and Terwilliger were

transferred to EVS and became his supervisors in early 2008.  (Hollowell Decl. ¶ 9.)  Specifically,

Hollowell alleges he has been subjected to numerous unwarranted disciplinary actions and has been

discriminated against by his various supervisors, including Sullivan, Terwilliger, Modica, and

Ingram.

Hollowell attributes this offensive conduct to his race; his discrimination complaints, the first

of which was filed in the summer of 2009; and his request for qualified medical leave. (Hollowell Dep. 65:5-20, 598:5-12, 603:6-15; Hollowell Decl. ¶ 66; Ex. 1; Warner ¶¶ 7, 9.) A number of individuals who assisted Hollowell in the filing and investigation of his complaints and grievances, and some coworkers, have also expressed opinions that Kaiser's treatment of Hollowell, and specifically that Sullivan, Terwilliger, Modica, were being very unfair, biased, and discriminatory toward Hollowell. (Harper Decl. ¶ 10; Brooks Decl. ¶ 5; Leach ¶ 4; Warner Decl. ¶¶ 5, 7, 10; Gardner Decl. ¶ 5; Butchek Decl. ¶ 4.)

### A. Excessive Absences

In early 2008, Kaiser amended its policies with regard to providing support for requests for family medical leave. (Ferguson Decl. Ex. H.) Under Kaiser's attendance policy in effect during the relevant periods, an unscheduled absence occurs when an employee is "not available for a scheduled shift due to illness or an inability to come to work, with time off from work not approved in advance by a supervisor." (Sullivan Decl. Ex. A at 2.) The Policy allows the use of Corrective Action Plans ("CAP") for employees who misuse time-off benefits. (Sullivan Decl. Ex. A at 3.) Three unscheduled absences in a rolling six-month period will result in joint discovery and a possible Level 1 CAP. (Sullivan Decl. Ex. A at 4.) Two additional incidents in any thirty-day period, or three additional incidents or an identified pattern in the next twelve months, results in additional joint discovery and a possible one-step increase in the CAP. (Sullivan Decl. Ex. A at 4.) Twelve months of demonstrated improvement will result in the removal of all CAPs. (Sullivan Decl. Ex. A at 4.)

"Family Medical Leave as defined by applicable State or Federal laws" ("Leave") and approved medical leave are not considered when addressing attendance issues. (Sullivan Decl. Ex. A at 2.) Kaiser's Human Resources Service Center ("HR Center") is solely responsible for

determining when a request for medical leave qualifies as Leave. (Sullivan Decl. ¶ 4.) "EVS managers and supervisors do not have authority or discretion to decide whether an employee's absence from work is protected leave under the OFLA or FMLA."[14] (Sullivan Decl. ¶ 4.) "Supervisors may request that employees provide reasonable proof of a bonafide personal illness or injury justifying their absence from work for the period claimed. Employees may also be required to provide proof of illness for a dependent minor child when the absence is three (3) or more occurrences in a rolling 12 month period (OFLA). A medical release form or proof of visit form will be accepted as valid evidence of a medical appointment/disability. Such certification should be requested prior to the employee returning to work." (Sullivan Decl. Ex. A at 2-3.) At the least, medical certification is required within fifteen days of an absence covered by Leave. (Ferguson Decl. ¶ 9.) The HR Center does not code an absence as Leave until it receives the medical certification necessary to establish that an absence qualifies as Leave. (Ferguson Decl. ¶ 9.) The HR Center advises EVS supervisors and managers whether Leave is granted or denied. (Sullivan Decl. ¶ 4.) The attendance policy specifically provides that "[s]upervisors are responsible for the consistent application of the Attendance Policy and will assess attendance as part of the ongoing performance evaluation process." (Sullivan Decl. Ex. A at 2.)

The record reveals that Hollowell requested Leave in 2003 to care for a child. (Hollowell

---

[14]Hollowell offered deposition excerpts from Andrew Loomis, an employee in Kaiser's Human Resources Department, in which Andrew stated that the administration of Leave requests was the responsibility of the employee's manager or supervisor, contradicting Sullivan's statement. (Loomis Dep. 23:2-5.) However, Loomis later clarified this statement limiting the supervisor's responsibility to monitoring of the employee's use of Leave, which is consistent with the language of the Attendance Policy. (Loomis Dep. 28:1-6.) Additionally, Loomis admitted that he had no responsibility for the administration, processing, or monitoring of Leave requests, inferring a lack of personal knowledge of the proper handling of Leave. (Loomis Dep. 20:9-15.)

Dep. 128:3-12.)  At that time, he was made aware of the need to submit the appropriate paperwork, including medical certification if requested, to qualify for Leave.  (Hollowell Dep. 129:23-130:7; 132:2-15.)  To obtain the requisite medical certification, Hollowell would request forms from the HR Center, complete the forms, and returned the forms to the HR Center.  (Hollowell Dep. 154:2-9.) The HR Center would then forward the forms to Hollowell's medical provider.  (Hollowell Dep. 154:2-9; Sullivan Decl. ¶ 4.)  The HR Center informed Hollowell by letter if his request for Leave was approved.  (Hollowell Dep. 154:6-10.)

From 2003 to 2008, Hollowell frequently requested Leave, including a request for extended Leave in the summer of 2007.  (Ferguson Decl. ¶ 7.)  In 2008, Hollowell began experiencing difficulty complying with Kaiser's attendance policy.  (Hollowell Dep. 218:19-219:1.)  While Hollowell claimed many of his absences qualified for Leave, he did not provide adequate documentation to support his request for Leave.  (Ferguson Decl. ¶ 6.)  Hollowell submitted paperwork that did not indicate the medical reason for his absence or that medical reason was a serious medical condition that qualified for Leave.  (Ferguson Decl. ¶ 8.) Occasionally, the medical certification provided by Hollowell covered specific dates rather than a blanket certification for a continuing serious medical condition.  (Ferguson Decl. ¶ 10.)  Kaiser advised Hollowell he needed to provide further medical certification for absences related to an existing medical condition not specifically covered by a prior certification.  (Ferguson Decl. ¶ 10.)

On November 14, 2008, Sullivan initiated a Level 1 CAP for  Hollowell's failure to comply with Kaiser's attendance policy.  (Sullivan Decl. Ex. B.)  Hollowell claimed his absences qualified as Leave but Kaiser required him to provide medical certification for the absences.  (Hollowell Dep. 226:7-13.)  Hollowell provided the requested medical certification and Kaiser approved all Leave

requests supported by a certification.  (Hollowell Dep. 226:10-18.)

On February 17, 2009, a second meeting was held to explore the need for a Level 2 CAP based on Hollowell's failure to improve his attendance as required under the initial CAP.  (Sullivan Decl. Ex. B at 1.)  While Hollwell's attendance had improved, he had accrued three additional unscheduled absences due to an ankle injury.  (Sullivan Decl. Ex. B at 1-2.)  By June 29, 2009, Hollowell had yet again accrued three additional unscheduled absences, resulting in a third meeting and a Level 3 CAP.  The Level 3 CAP indicated Hollowell had twenty-seven absences from work due to illness in the prior twelve months, occurring primarily on Monday and Tuesday.  (Sullivan Decl. Ex. D.)

On August 27, 2009, Kaiser placed Hollowell on Level 4 CAP for continuing Policy violations.  (Sullivan Decl. Ex. E.)  At that time, Kaiser's records showed that Hollowell had twenty-three days of Leave, with an additional thirty days of absences for which Hollowell had provided no, or insufficient, medical certification and were, therefore, designated as unscheduled absences. (Ferguson Decl. ¶ 12.)  Hollowell was given a day of paid leave on August 30, 2009, to decide whether he would commit to a last chance agreement or voluntarily resign.  (Sullivan Decl. Ex. E.)  On August 31, 2009, Hollowell signed the Level 4 CAP indicating he wanted to retain his employment, had completed a draft action reform plan, was prepared to participate in a last chance agreement, and was committed to improving his performance.  (Sullivan Decl. Ex. E at 2.)  In October 2009, Hollowell was placed on paid administrative leave based, in part, on his continuing and excessive absences.  (Noble Decl. Ex. D. at 5.)

In a letter dated October 27, 2009, Terwilliger informed Hollowell that based on the medical certifications provided, Hollowell was entitled to Leave for absences on March 4-5, 2009, and May

1, 6, and 7, 2009, but that additional absences remained unprotected and subject to the disciplinary provisions of Kaiser's attendance policy. (Sullivan Decl. Ex. F.) She then reminded Hollowell of her requests for additional medical certifications during conversations on June 29, 2009, July 14, 2009, August 4, 2009, and August 27, 2009. (Sullivan Decl. Ex. F.) Terwilliger again requested updated medical certifications to clarify whether any additional unscheduled absences qualified as Leave and advised Hollowell that such certifications must be provided by November 10, 2009, or the absences would remain unprotected. (Sullivan Decl. Ex. F.) On December 4, 2009, Kaiser again wrote to Hollowell advising him that his absences on "April 15, July 6, 9, 12, and 19, and August 2 and 5, 2009, were considered unprotected" based on Hollowell's failure to clarify or update his medical certifications to include these dates or provide evidence that the absences qualified for Leave. (Ferguson Decl. ¶ 14; Ex. L at 2.)

Eventually, the issues related to Hollowell's absences were resolved. The Level 4 CAP issued to Hollowell was reduced to a Level 2 CAP and the Level 3 and 4 CAPs were expunged from his personnel file. (Ferguson Decl. ¶ 6.) To date, all of Hollowell's leave requests for which he provided proper medical certification have been properly classified as protected time. (Hollowell Dep. 12:4-8.) Since January 2010, Hollowell has had no complaints regarding Kaiser's handling of his requests for Leave. (Hollowell Dep. 12:22-25.)

B. Time Clock

Kaiser requires all hourly employees to "log in and out at their work station using the IVR (phone) system at the start and end of each scheduled shift." (Sullivan Decl. Ex. G at 1.) On December 30, 2008, Kasier placed Hollowell on a Level 1 CAP as a reminder to use the automated IVR time system ("IVR System") to clock in and out of work on a daily basis. (Sullivan Decl. Ex.

H.)  Subsequently, time records revealed that Hollowell failed to clock out at the end of his shift approximately twenty-five times between June and September 2009, most often occurring the evening before a day Hollowell was absent from work.  (Loomis Decl. ¶ 4.)  Kaiser, who was aware of problems with the IVR System during this period, informally worked with Hollowell to correct this issue.  (Loomis Decl. ¶ 4; Harper Decl. ¶ 34.)

        In the summer of 2009, Hollowell failed to clock out or notify his supervisor, Terwilliger, when he unexpectedly left work to attend to a personal matter.  (Sullivan Decl. ¶ 12; Ex. G at 1.)  Hollowell's conduct could have been characterized as "time-card fraud" and resulted in Hollowell's termination.  (Sullivan Decl. ¶ 12; Loomis Decl. ¶ 3.)  Kaiser's Human Resources Department ("HR Department") and Terwilliger attempted to work with Hollowell and the Union to investigate Hollowell's actions, however, neither Hollowell nor his Union representative attended a meeting scheduled in early October 2009 to discuss the incident.  (Sullivan Decl. ¶¶ 12, 14.)  Kaiser placed Hollowell on paid administrative leave on October 12, 2009, pending resolution of the time-card fraud and excessive absence investigations.  (Sullivan Decl. ¶ 14.)  Sullivan and Terwilliger "high-fived" each other as Hollowell was being escorted out of the building by security guards.  (Hollowell Decl. ¶ 30; Shambry Decl. ¶ 13.)  By the time Hollowell was allowed to return to work in December 2009, he had been exonerated of the time-card fraud charges.  (Ferguson Decl. ¶ 21.)

        *C.  Annual Compliance Training*

        Kaiser requires all of its employees to complete annual compliance training ("Annual Training").  Kaiser's Integrity, Compliance and Ethics Department ("Compliance Department") tracks employee's completion of the Annual Training and informs an employee's supervisor when the requirement is not met.  (Sullivan Decl. ¶ 15.)

On October 30, 2009, Margaret Moon of the Compliance Department ("Moon"), advised Sullivan by email that Hollowell had not completed the Annual Training for 2009 and directed her to immediately notify Hollowell that he was being placed on unpaid leave effective November 1, 2009. (Sullivan Decl. Ex. H.)  In a letter dated November 3, 2009, Terwilliger informed Hollowell that he had not completed the Annual Training and was being placed on unpaid leave effective immediately.  (Sullivan Decl. Ex. K.)  Terwilliger advised Hollowell was advised that failure to complete the course by November 13, 2009, would result in his termination.  (Sullivan Decl. Ex. K.)

Hollowell had difficulty completing the Annual Training as it was available only through Kaiser's internet and Hollowell, who was out on paid administrative leave for his attendance issues and time-card fraud charges, was not allowed on Kaiser's premises without prior authorization. (Hollowell Decl. ¶ 33.)  Hollowell attempted to  contact Terwilliger on a few occasions to obtain such authorization.  (Hollowell Decl. ¶ 33.)  On November 18, 2009, Terwilliger, at Moon's direction, informed Hollowell in writing that he was terminated as of November 18, 2009, for failure to complete the Annual Training.  (Sullivan Decl. Ex. N.)

In subsequent meetings to address Hollowell's termination, Hollowell represented that he completed the training before November 13, 2009.  (Sullivan Decl. ¶ 20.)  Kaiser investigated Hollowell's claims and discovered that Hollowell had accessed the Annual Training on November 10, 2009, but failed to press the button to submit his answers to the test questions, resulting in the identification of his status as incomplete.  (Sullivan Decl. ¶ 20; Ex. O.)  Based on this discovery, Kaiser found Hollowell completed the Annual Training and placed him back on paid administrative leave pending the outcome of the attendance and possible time-card fraud issues.  (Sullivan Decl. ¶ 20.)  These issues were eventually resolved and Hollowell was authorized to return to work on

December 23, 2009.  (Ferguson Decl. ¶ 21.)  However, Hollowell requested, and received, Leave for the remainder of the year and did not work again until early January, 2010.  (Ferguson Decl. ¶ 22.)

### D.  Modica Incidents

Kaiser "maintains a zero tolerance philosophy towards acts of aggressive and/or violent behavior in the workplace. . . .  Violation of this policy may result in immediate disciplinary action up to and including termination of employment and may be recommended for prosecution." (Sullivan Decl. Ex. U.)   On May 4, 2010, Kaiser placed Hollowell on a Level 4 CAP based on reports from Modica that Hollowell had engaged in acts of gross misconduct, disobedience, and insubordination.  (Sullivan Decl. ¶ 28; Ex. S.)  After participating in joint discovery with the Union, the Level 4 CAP was reduced to a Level 1 CAP, reflecting only coaching and counseling with no discipline.  (Sullivan Decl. ¶ 30.)

 On May 26, 2010, while Kaiser and the Union were engaged in joint discovery on the allegations of miscondcut, Kaiser sent Hollowell home and placed him on paid administrative leave while it and the Union jointly investigated a separate complaint from Modica that Hollowell had grabbed and physically threatened him. (Sullivan Decl. ¶¶ 31-32.)  The investigation revealed that Hollowell's actions did not violate Kaiser's workplace violence policy and Hollowell eventually returned to work with no disciplinary actions taken.  (Sullivan Decl. ¶ 32.)

## II.  Discriminatory Conduct by Supervisors

Hollowell's complaints of discrimination and retaliation revolve primarily around four of his supervisors.  Sullivan became one of Hollowell's supervisors in early 2008, when she was assigned to the position of EVS manager.  (Sullivan Decl. ¶¶ 1,2; Hollowell Decl ¶ 9.)   Terwilliger, as an EVS Supervisor, was Hollowell's direct supervisor from early 2008 to December 2009. (Ferguson

Decl. ¶ 23; Hollowell Decl ¶ 9.)    Modica was assigned to Terwilliger's position and became Hollowell's immediate supervisor when he returned to work in January 2010.  (Sullivan Decl. ¶ 28; Hollowell Dep. 14:18-24.)  Finally, Ingram replaced Modica in August 2010.  (Ferguson Decl. ¶ 23; Hollowell Decl ¶ 58.)

### A. *Sullivan*

In June 2008, Hollowell overheard Sullivan tell Terwilliger that "no blacks would work any of the day shifts."  (Hollowell Decl. ¶ 17.)  In October 2008, Hollowell requested he be allowed to take bereavement leave.  (Hollowell Decl. ¶ 22.)  Sullivan allowed the request but only after Hollowell provided her a copy of an obituary as proof that he attended his mother's funeral. (Hollowell Decl. ¶ 22.)

In late 2008 or 2009, while Hollowell was working in the MRI position, Sullivan approached Hollowell with concerns that dolls and hair mousse was missing from offices cleaned by Hollowell. (Hollowell Dep. 594:6-23; 598:18-599:5.)  Hollowell felt that he was being unfairly accused of theft as a result of his race.  (Hollowell Dep. 594:6-23; 596:19-597:7.)  Hollowell was not disciplined in any way for the alleged thefts.  (Hollowell Dep. 597:13-14.)

Beginning in 2009, Sullivan periodically changed Hollowell's job assignment, allowing him to work his regular assignment in the MRI, but occasionally assigning him to less desirable, more difficult assignments, despite his seniority and entitlement to a regular assignment.  (Hollowell Decl. ¶¶ 15, 16.)  In his declaration, Hollowell states that he continued to float from the end of 2009 through approximately 2011 and one of his Union representatives represents that Hollowell was placed on the bottom, or left off, of assignment sheets throughout 2010 and part of 2011, which contradicts with Hollowell's deposition testimony that he was regularly assigned to the kitchen

position in 2010.  (Hollowell Decl. ¶ 15; Hollowell Dep. 15:6-8; Leach Decl. ¶ 12.)  Hollowell feels

that Sullivan assigned him to the kitchen position in retaliation for his race discrimination complaints

in 2009.  (Hollowell Dep. 68:1-18.)

Shortly after the restructure of EVS in late 2009, most of the regular assignments were filled

by Caucasian employees.  (Hollowell Decl. ¶ 18.)  Specifically, during the first two years of

Sullivan's tenure as EVS Manager, the number of African-Americans working in EVS dropped from

approximately twelve to about three or four.  (Hollowell Decl. ¶ 20.)  Hollowell felt that Sullivan

and Terwilliger used the restructuring as a way to rid EVS of minority employees.  (Hollowell Decl.

¶ 18.)

Upon his return to work in January 2010, Hollowell continued to work as a housekeeping

aide but was assigned a different area by Sullivan.  (Hollowell Dep. 13:11-20.)  The MRI position

no longer existed at that time.  (Sullivan Decl. ¶ 24; Hollowell Dep. 25:16-20.)  To accommodate

Hollowell's desire to work forty hours a week during the swing shift starting in the late afternoon,

Sullivan initially assigned Hollowell to a variety of housekeeping aide assignments on an as-needed

basis.  (Sullivan Decl. ¶¶ 21, 24; Hollowell Dep. 433:9-18.)  In April 2010, Hollowell initiated a

grievance requesting a regular assignment, rather than *ad hoc* housekeeping assignments.  (Sullivan

Decl. ¶ 25; Ex. 21.)  In response to Hollowell's complaint, Sullivan offered him the kitchen position,

which Hollowell declined.  (Sullivan Decl. ¶ 26.)  Sullivan then offered him the combined

MRI/engineering areas position, the only other regular full-time assignment available during

Hollowell's preferred swing shift.  (Sullivan Decl. ¶ 26.)  Hollowell rejected the MRI/engineering

assignment but then accepted the kitchen position when offered to him a second time by Sullivan.

(Sullivan Decl. ¶ 26; Hollowell Dep. 15:6-8.)

Page 47 - FINDINGS AND RECOMMENDATION                    *{SIB}*

In 2011, Hollowell bid for, and was assigned to, a bed-making position. (Sullivan Decl. ¶ 27; Hollowell Dep. 15:6-8) After working in the bed-making position for less than thirty days, Hollowell decided he did not want to be exposed to the germs in the patient rooms, and requested a return to the kitchen position, which was allowed. (Sullivan Decl. ¶ 27; Hollowell Dep. 28:7-23.) Hollowell has continued in the kitchen position since then and has not requested another reassignment. (Sullivan Decl. ¶ 27; Hollowell Dep. 30:1-7.)

B. *Terwilliger*

Terwilliger participated in assigning Hollowell *ad hoc* to less desirable, more difficult, job assignments in 2009, taking him away from his regular assignment in the MRI position. (Hollowell Decl. ¶¶ 15, 16.) As a follow-up to Sullivan's concerns regarding items missing from the offices that Hollowell cleaned, Terwilliger cautioned Hollowell that security cameras were being installed in the offices. (Hollowell Dep. 595:4-8.) Again, Hollowell felt that he was being unfairly accused of theft as a result of his race but was not disciplined in any way for the alleged thefts. (Hollowell Dep. 594:6-23; 596:19-597:7; 597:13-14.) Terwilliger made comments which were offensive to Hollowell, such as "Where did you get the money to get such a car?" and "How do you afford so many pairs of shoes?" (Harper Decl. ¶ 8.)

C. *Modica*

Modica regularly criticized Hollowell's work performance, which intimidated Hollowell. (Brooks Decl. ¶ 22.) Additionally, Modica was involved in assigning Hollowell to less than desirable positions before his regular assignment to the kitchen in the middle of 2010. (Hollowell Decl. ¶41.) Modica also used unidentified racial slurs with regard to Hollowell. (Brooks Decl. ¶¶ 22-23.) For example, Modica once said to Hollowell "You ratted me out you nigger. I'm not your

supervisor I'm your master."  (Butchek Decl. ¶ 7.)

In early 2010, when Hollowell asked Modica what area he would be working in that day, Modica responded "I don't care what you do.  You can go shine door knobs for all I care." (Hollowell Decl. ¶ 47.)  Thereafter, Modica accused Hollowell several times of inappropriate language, threats of violence, insubordination and, on one occasion, of a physical assault.  (Hollowell Decl. ¶¶ 44-46.)  Hollowell states he was escorted from Kaiser property, and was threatened with administrative leave, more than once as a result of Modica's accusations.  (Hollowell Decl. ¶¶ 44-46.)  Hollowell concedes it is reasonable to place an employee accused of workplace violence on leave while the accusations are being investigated.  (Hollowell Dep. 600:3-16.)  The accusations were investigated and Hollowell was cleared of the allegations.  (Hollowell Decl. ¶¶ 44-46.)  Since Modica left his employment with Kaiser in August 2010, Hollowell has been counseled about performance issues but not disciplined.  (Hollowell Dep. 37:12-23.)  In 2012, Modica threatened Hollowell and used racially derogatory epithets towards him while visiting Kasier.  (Hollowell Decl. ¶ 49.)

*D.  Ingram*

Ingram became Hollowell's direct supervisor after Modica left his employment with Kaiser. Ingram immediately increased Hollowell's work load, assigned him job duties outside his physical limitations, and constantly criticized Hollowell's work performance.  (Hollowell Decl. ¶¶ 57, 58.) Ingram told Hollowell, in early 2012, that Sullivan told him to make things difficult for Hollowell and that was the only reason he engaged in such conduct.  (Hollowell Decl. ¶¶ 50, 57, 58.)

## III.  Comparators

In November 2010, housekeeping aides Ken Cross ("Cross") and Chris Clauson ("Clausen")

were asked by their supervisor, Marty Peterson, EVS Supervisor ("Peterson") to perform special projects outside the normal duties of a housekeeping aide. (Peterson Decl. ¶ 4.) To compensate them for their extra services, Peterson directed Cross and Clausen to clock in with a special code while working on the special projects which would increase their hourly wage for that time. (Peterson Decl. ¶ 4.) Thereafter, Sullivan discovered she was over budget and, upon investigation, determined that Cross and Clauson were receiving floor care wages for some of their work. (Sullivan Dep. 137:1-138:7.) Sullivan told Peterson that Cross and Clauson should no longer be paid the higher wage. (Peterson Decl. ¶ 6; Sullivan Dep. 142:2-3.) Peterson spoke with Cross and Clauson and told them to discontinue their use of the special code. (Peterson Decl. ¶ 7.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2012). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2012). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  First and Second Claims for Relief – Violation of the Acts

In his First Claim for Relief, Hollowell alleges Kaiser interfered with his right to take leave under the Acts when it refused to return him to his former position, or an equivalent thereof, when he returned from Leave. Hollowell's Second Claim for Relief alleges that Kaiser retaliated against him for taking Leave in violation of the Acts. Kaiser argues that Hollowell's claims are barred by the statute of limitations. In the alternative, Kaiser argues Hollowell is unable to establish a *prima facie* claim for either interference or retaliation.

The Federal Act has a general two-year statute of limitations. 29 U.S.C. § 2617(c)(1).  In the event a defendant willfully violates the Federal Act, the statute of limitations extends to three years. 29 U.S.C. § 2617(c)(2).  The statute of limitations for violations of the Oregon Act is one year.  OR. REV. STAT. 659A.875.  Hollwell relies on his requests for Leave in 2008 and 2009, his complaints regarding Kaiser's handling of such requests in mid-2009, his subsequent CAPs, his termination in November 2009, and Kaiser's failure to return him to his MRI position upon his return in January 2010, in support of his claims under the Acts.

   Hollowell filed this action on October 22, 2012, which is clearly more than two years after his termination in late 2009 or his return to work in January 2010, the two primary actions supporting Hollowell's claims under the Acts.  Consequently, Hollowell's claim under the State Act is barred by the one-year statute of limitations.  Hollowell's claim under the Federal Act is timely only if Hollwell has established that Kaiser wilfully violated the Federal Act, allowing him to rely on Kaiser's conduct from October 22, 2009, to the present.

To establish a willful violation of the Federal Act, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  The Federal Act allows an employer to require medical certification from the health care provider in support of a request for Leave and requires an employee to provide a copy of requested certification to the employer in a timely manner.  29 U.S.C. § 2613(a) (2013).  Medical certification is sufficient if it states the date on which the serious medical condition commenced, the probable duration of the condition, appropriate medical facts regarding the condition, a statement that the employee is unable to perform his job duties, and, if the leave will be on an intermittent basis, a statement that such intermittent

leave is medically necessary. 29 U.S.C. § 2613(b) (2013). An employer may require an eligible employee to obtain subsequent recertifications on a reasonable basis. 29 U.S.C. § 2613(e) (2013). Upon return from Leave, an employee is to be restored to the same position he held before he took Leave or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1) (2013).

The record reveals that from 2008 to 2009, Hollowell failed to provide the necessary medical certifications for his Leave despite many requests from Kaiser to do so, or provided incomplete medical certifications not containing the information required by the Federal Act. From November 2008 to June 2009, Kaiser worked regularly with Hollowell to obtain the requisite medical certifications and awarded Hollowell Leave when properly supported by a certification despite Hollowell's failure to provide the certifications in a timely manner as required under the Federal Act. When Kaiser placed Hollowell on a Level 4 CAP for his excessive absences, he had been awarded twenty-three days of Leave in the prior twelve months but had thirty additional absences not supported by proper medical certification. On October 27, 2009, Terwilliger advised Hollowell that he had been awarded five additional days of Leave based on recently provided medical certifications, reminded him of the numerous previous requests for medical certification supporting currently unscheduled absences, and directed Hollowell to provide additional certifications by November 10, 2009, or the absence would remain unscheduled. As of December 4, 2009, at least seven of Hollowell's absences remained unsupported by proper medical certification. By the time Hollowell returned to work in January, 2010, he had provided proper medical certification and been granted Leave for all qualifying absences in 2008 and 2009. Hollowell has not experienced any issues with Leave since January 2010.

Page 53 - FINDINGS AND RECOMMENDATION                                                  *{SIB}*

Hollowell returned to work in the same position and at the same wage rate as before he took Leave. Because his prior position no longer existed due to department restructuring, Sullivan and Modica assigned Hollowell to similar positions available during his desired swing shift. When Hollowell complained about his lack of a permanent assignment in April 2010, Kaiser offered him the two regular assignments available at that time, kitchen and MRI/Engineering. Hollowell accepted the kitchen position in July 2010 and, other than a brief period of time where he worked a bed-making position at his request, has continued to work in that position.

Kaiser's ongoing attempts to obtain the medical certification required under the Federal Act to support all of Hollowell's requests for Leave, and its willingness to accept such certifications despite well beyond the "timely manner" required under the Federal Act, as well as its cooperation in finding a regular assignment with equivalent duties, work schedule and wages as Hollowell's prior assignment, overwhelmingly dictates against a finding that Kaiser knew, or showed reckless disregard with regard to whether, its conduct was prohibited by the Federal Act. Kaiser did not willfully violate the Federal Act. Accordingly, the three-year limitations period for willful violations does not apply here and Hollowell's claims under the Federal Act are barred by the general two-year statute of limitations. Kaiser is entitled to summary judgment on Hollowell's First and Second Claims for Relief for violation of the Acts.

II. Eighth Claim and Ninth – Violations of Section 1981

Hollowell alleges Kaiser violated his rights under Section 1981 by subjecting him to discriminatory investigations and discipline based on his race. Kaiser moves for summary judgment on these claims arguing Hollowell is unable to prove he was subjected to an adverse employment action, he was treated differently from similarly situated Caucasian employees, and Kaiser has

offered a legitimate non-discriminatory reason for its actions.

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (2013). Under Section 1981(b), "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

The standard for establishing a *prima facie* case of employment discrimination under Section 1981 is the same used to establish a *prima facie* case of disparate treatment under Title VII of the Civil Rights Act of 1964. *Gay v. Waiters' & Dairy Lunchmen's Union Local No. 30*, 694 F.2d 531, 539 (9th Cir. 1982); *see also Navarette v. Nike, Inc.*, CV-05-1827-AS, 2007 WL 2890976, *5 (D. Or. September 28, 2007). Under Title VII, a plaintiff may establish a *prima facie* case of disparate treatment by either direct or circumstantial evidence of discriminatory intent. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). Direct evidence is defined as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the *fact finder* to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (citation omitted) (alteration in original).

A plaintiff may establish a *prima facie* case of disparate treatment through circumstantial

evidence showing:  (1) he belongs to a protected class; (2) he was qualified for a job or was performing according to his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) similarly situated Caucasians were treated more favorably.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  Where the plaintiff is able to establish a *prima facie* case of discrimination, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the employer's action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Davis*, 520 F.3d at 1089.  If the employer satisfies this burden, the plaintiff must demonstrate that the "reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' "  *Davis*, 520 F.3d at 1089 (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000)); *see also McDonnell Douglas*,  411 U.S. at 804.

## A.  Discriminatory Investigations

Hollowell apparently contends that the 2008 or 2009 accusation of theft and the 2010 accusation of assault resulted in discriminatory investigations.  While Hollowell has offered evidence of racial comments by Sullivan and Modica, the individuals making the accusations at issue, Hollowell fails to present any direct evidence that the individuals conducting the alleged discriminatory investigations  engaged in conduct or made statements reflecting a discriminatory attitude.  Therefore, Hollowell has failed to establish a Section 1981 for discriminatory investigations with direct evidence.

Kaiser does not dispute that Hollowell, an African Amercan, is a member of a protected class or that he was qualified, and performing adequately, as a housekeeping aide.  Kaiser does argue that

Hollowell has failed to present evidence that Hollowell was subject to an adverse employment action or that he was treated differently than his Caucasian counterparts.

1.  Accusation of Theft

In 2008 or 2009, Sullivan approached Hollowell with concerns that items were missing from the offices Hollowell cleaned.  No resulting investigation or punishment ensued.

A majority of the federal Circuit Courts, including the Ninth Circuit, take an expansive view of the type of actions that can be considered adverse employment actions.  *See, e.g., Ray v. Henderson*, 217 F.3d 1234, 1241-1243 (9th Cir. 2000).  Among the employment actions that may constitute an adverse employment action under federal law depending on the circumstances are termination, dissemination of an unfavorable employment reference, issuance of an undeserved negative performance review, refusal to consider for promotion, exclusion from meetings, seminars and positions providing eligibility for salary increases, denial of secretarial support, a more burdensome work schedule, and a lateral transfer.  *Id*. at 1241; *see also Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.").  Generally, "an employment action is adverse only if it causes a material change in the terms or conditions of employment."  *See King v. Slater*, Nos. CIV 98-639-KI, CIV 98-1292-KI, 1999 WL 978020, *3 (D. Or. Oct. 26, 1999)(discussing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir. 1994)).

An employer's comment to an employee that personal property items are missing from areas where the employee has access, without more, is not an adverse employment action.  While

Hollowell may have been offended by the comment, his employment status was not altered in any way by Sullivan's statement.

### 2. Accusation of Assault

Modica's accusations of insubordination and assault resulted in the issuance of a Level 4 CAP and Hollowell's placement on paid administrative leave pending resolution of the charges. Hollowell concedes that it was reasonable for Kaiser to place him on leave during this period. Ultimately, the Level 4 CAP was reduced to a Level 1 CAP, resulting in no discipline to Hollowell. Hollowell returned to work in the same position, shift, and wage rate and did not suffer a material change in the terms or conditions of employment as a result of the investigation.

### B. Discriminatory Discipline

Hollowell's claim for discriminatory discipline is based on the Level 4 CAP issued as a result of his excessive absences. While Kaiser attempted to work with Hollowell to resolve the issues resulting in the Level 4 CAP, Hollowell remained employed or on paid administrative leave. Eventually, Hollowell provided the requisite medical certifications to Kaiser to support his various claims for Leave and was awarded such Leave. At that time, the Level 4 CAP was reduced to a Level 2 CAP, which is not considered a disciplinary action. Upon returning to work after requesting, and receiving, Leave for the remainder of December 2009, Hollowell returned to work in his desired shift at a similar job and same wage rate. Kaiser's actions with regard to Hollowell's excessive absences and failure to timely provide medical certification necessary to support his request for Leave did not adversely affect his continuing employment with Kaiser.[15]

---

[15]In his opposition brief, Hollowell requests leave to amend his complaint to allege a hostile work environment under Section 1981 if the court finds he has failed to establish a Section 1981 claim for discriminatory discipline. This court previously denied his request to amend his complaint

Hollowell did not suffer an adverse employment action as a result of Sullivan's theft accusation, Modica's assault accusation, or Kaiser's attempt to address Hollowell's excessive absences and failure to comply with the Federal Act's medical certification requirement. Consequently, Hollowell is unable to state a claim for violation of Section 1981 based on discriminatory investigations and discipline. Kaiser is entitled to summary judgment on Hollowell's Eighth and Ninth Claims for Relief under Section 1981.

III.  Tenth Claim for Relief – Retaliatory Acts in Violation of Section 1981 and Section 659A.030

Hollowell argues that Sullivan and Terwilliger issued the Level 4 CAP and refused to assign him to a regular position when he returned to Kaiser in January 2010 in retaliation for complaining about racial discrimination in July 2009. To present a *prima facie* case for retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) defendants subjected him to an adverse employment action; and (3) the adverse employment action was a result of plaintiff's engagement in the protected activity. *Ray*, 217 F.3d at 1240.[16] Kaiser concedes, for the purposes of this motion, that Hollowell engaged in protected activity. Kaiser argues, however, that Hollowell is unable to establish he was subjected to an adverse employment action or a causal relationship between the protected activity and alleged adverse action. Additionally, Kaiser argues a legitimate, non-discriminatory reason for its actions exists.

The court has already determined that Kaiser's actions with regard to Hollowell's excessive

---

to add a hostile environment under Section 1981 based on supervisor harassment and sees no reason to reconsider this ruling. (Minute Order dated July 15, 2013.)

[16]The substantive analysis for claims under Title VII, Section 1981,and Section 659A.030 is the same. *Campbell v. Knife River Corp.*, 783 F. Supp. 2d 1137, 1147 (D. Or. 2011). Accordingly, the analysis of Hollowell's claim under Section 1981 is equally applicable to his claim under Section 659A.030.

Page 59 - FINDINGS AND RECOMMENDATION                                    {SIB}

absences was not an adverse employment action.  Even assuming the Level 4 CAP, issued shortly after Hollowell complained about racial discrimination in July 2009 ,was an adverse employment action, the Level 4 CAP was the culmination of a nearly year-long process to resolve Hollowell's inadequately supported requests for Leave. The Ninth Circuit has held that an employer is not required to cease pursuing a disciplinary course of action against an employee simply because that employee engaged in some form of protected activity.  *Swan v. Bank of America*, 360 Fed. Appx. 903, 906 (9th Cir. 2009)(addressing a claim for retaliation under the Federal Act. )

Upon his return to Kaiser in January 2010, Hollowell was not assigned to his previous MRI position because that position no longer existed, not because he filed a discrimination complaint in July of the previous year.  To accommodate Hollowell's request to work only on the swing shift, Sullivan assigned him to work in various areas performing housekeeping aide duties at the wage rate Hollowell was entitled based on his seniority and position.  The mere fact that Hollowell was not immediately assigned a regular position is not an adverse employment action, and Hollowell presents no authority to support that proposition.  Furthermore, the lapse of nearly six months between the protected activity and Hollowell's floating, when viewed in light of Kaiser's willingness to work with Hollowell on his excessive absence, possible time-card fraud, and Annual Training issues during that six-month period, eliminate any inference of a causal connection.

Hollowell has failed to establish he suffered an adverse employment action or the existence of a causal connection between his protected activity and an alleged adverse action.  Kaiser is entitled to summary judgment on Hollowell's Tenth Claim for Relief.

/ / / / /

/ / / / /

Page 60 - FINDINGS AND RECOMMENDATION                                    *{SIB}*

IV.  Additional Issues

    *A.  Motion to Amend Complaint to Add Hostile Environment Claim*

    In his opposition brief, Hollowell requests leave to amend his complaint to allege a hostile work environment under Section 1981 if the court finds he has failed to establish a Section 1981 claim for discriminatory discipline.  This court previously denied his request to amend his complaint to add a hostile environment under Section 1981 based on supervisor harassment and sees no reason to reconsider this ruling.  (See Minute Order dated July 15, 2013. ECF No. 25.)

    *B.  Supplemental Briefing*

    On the evening of Saturday, July 13, 2014, nearly seven months after briefing on the summary judgment motions was completed and just two days before oral argument on those motions, Hollowell moved for leave to file supplemental briefing in opposition to Kaiser's motion for summary judgment.  The court denied this motion at oral argument finding the arguments made in the briefing, and exhibits offered in support, existed and could have been made at the time Hollowell filed his opposition brief on October 8, 2013.

    Hollowell referenced the supplemental briefing at oral argument while addressing the court's questions on Kaiser's wilful violation of the Federal Act.  Specifically, Hollowell argued Kaiser required Hollowell to recertify his long-term medical conditions more often than every thirty days from March 2009 through November 2009, and disciplined him for failing to do so, in violation of the Federal Act and Kaiser's own policy against requiring medical recertifications more often than every thirty days.  Assuming the court had not denied Hollowell's motion to supplement his briefing and him to offer this argument, the evidence offered by Hollowell with his supplemental briefing does not support Hollowell's claims.

The exhibits filed with the supplemental briefing establish that Hollowell provided medical certifications dated October 28, 2009, and December 15, 2009, authorizing intermittent leave of two to three days a month for recurrent episodes of gout, specific certifications for gout-related leave that exceeded the two to three days a month and/or preceded the intermittent certifications, and reports of work ability after Hollowell missed work for gout or other medical conditions. Hollowell also offered a medical certification signed by a medical provider on February 2, 2010, indicating an effective date of March, 1, 2009, a duration of one year, and an expected intermittent time loss of two to three days a month due to his chronic gout, as well as a recertification of that condition for another year starting on May 10, 2010, signed on May 13, 2010. This evidence does not establish that Kaiser requested medical recertification for intermittent leave related to Hollowell's gout, or any other chronic condition, more often than every thirty days. When asked by the court if evidence previously offered by Hollowell supported his new argument, Hollowell referenced a document in which Kaiser sought information related to Hollowell's request for accommodations, not a request for Leave. Accordingly, Hollowell's supplemental argument based on medical recertification fails for lack of supporting evidence.

### Conclusion

Kaiser's motion (#57) for partial summary judgment on Hollowell's First and Second Claims for Relief for violation of the Acts, Eighth and Ninth Claims for Relief for violations of Section 1981, and Tenth Claim for Relief for violations of Section 1981 and Section 659A.030 should be GRANTED. In light of Hollowell's concession on his Third and Fourth Claims for Relief for violation of state law disability discrimination claims and this court's ruling recommending summary judgment on Hollowell's pay-related claims alleged in his Fifth, Sixth, and Seventh Claims for

Relief, this action should be dismissed with prejudice.  Kaiser's objections to Hollowell's evidentiary submissions are overruled with regard to specific material offered in the declarations of Leach, Brooks, Hollowell, Gardner, Butchek, and Shambry as identified above and sustained in all other respects.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **August 12, 2014**.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 28th day of July, 2014.


/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge